IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Joseph D. Zarkowski, | ) | |
| | ) | Civil Action No. 6:05-0196-PMD-WMC |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Jo Anne B. Barnhart, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security Administration that the plaintiff was not entitled to disability insurance benefits ("DIB").

**ADMINISTRATIVE PROCEEDINGS**

On September 20, 2002, the plaintiff filed an application for DIB alleging disability beginning December 26, 2001. The application was denied initially and on reconsideration. On October 7, 2004, the plaintiff requested a hearing, which was held on April 26, 2004. Following the hearing, at which the plaintiff, his attorney and a vocational

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

expert appeared, the administrative law judge considered the case *de novo*, and on July 30, 2004, determined that the plaintiff was not entitled to benefits. This determination became the final decision of the Commissioner when it was adopted by the Appeals Council on December 2, 2004.

In making the determination that the plaintiff was not entitled to benefits, the ALJ made the following findings:

(1)     The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

(2)     The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

(3)     The claimant's degenerative disc disease is a "severe" impairment, based upon the requirements in the Regulations (20 CFR § 404.1520(c)).

(4)     This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

(5)     The undersigned finds the claimant's allegations regarding his limitations are not fully credible for the reasons set forth in the body of the decision.

(6)     The claimant has the residual functional capacity to: sit, stand and walk for 6 hours of an 8 hour day; occasionally lift 20 pounds; frequently lift 10 pounds; never crawl, crouch, climb, squat or kneel; never use his lower extremities for pushing/ pulling; and never use his upper extremities for working above shoulder level.

(7)     The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

(8)     The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

(9)     The claimant has a "high school education" (20 CFR § 404.1564).

(10)   Transferability of skills is not an issue in this case (20 CFR § 404.1568).

(11)   The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

(12)   Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, and based on the testimony of the vocational expert, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as: a storage facility clerk (This is light work with 20,000 jobs existing in the national economy); an attendant at a convenience store (This is light work with 800,000 jobs existing in the national economy); or a grader/sorter (This is light work with 250,000 jobs existing in the national economy).

(13)   The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

The only issues before the court are whether the findings of fact are supported by substantial evidence and whether proper legal standards were applied.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."   42 U.S.C. §423(a).   "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged

3

in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v.*

*Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th

Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to
> support a particular conclusion.  It consists of more than a mere
> scintilla of evidence but may be somewhat less than a
> preponderance.  If there is evidence to justify a refusal to direct
> a  verdict were the case before a jury, then there is "substantial
> evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to

assure that there is a sound foundation for the Commissioner's findings, and that her

conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there

is substantial evidence to support the decision of the Commissioner, that decision must be

affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 41 years old as of the date he allegedly became disabled,

December 26, 2001, and 43 years old as of the date of the ALJ's decision, July 30, 2004

(Tr. 51).  He has a high school education plus technical training (Tr. 62), and worked in the

vocationally relevant past as a mechanic, carpenter, welder, and truck driver (Tr. 57).

The plaintiff began experiencing back pain at work in August 2000, and an

MRI subsequently showed a herniated disc at L5-S1.  He underwent an L4-5 laminectomy

and discectomy on September 5, 2000, and initially did very well after surgery, with only

mild back pain.  Spinal specialist Dr. John F. Johnson ("Dr. J. Johnson") indicated in

November 2000 that it was "very unlikely that [Plaintiff] would be able to return to his

previous level of work," but that he was a good candidate for vocational rehabilitation.

Medical records dated November 29, 2000, noted that the plaintiff is allergic to codeine-

based medications.  In February 2001, Dr. J. Johnson recommended that the plaintiff not

return to heavy work, but released him to "full duty work."  The plaintiff returned to work in

5

March 2001 (first in construction and then as a diesel mechanic), and did well until October 2001, at which point he developed gradual onset of low back pain, which increased by the end of the year.  He stopped working on December 26, 2001 (Tr. 125, 154-58).

The plaintiff returned to Dr. J. Johnson on February 1, 2002, after a one-year absence.  The plaintiff described his diesel mechanic job as "very heavy duty type work," and indicated he had worked 10 to 12 hours per day from July until December 2001.  He reported worsening back pain and right leg pain.  On examination, the plaintiff used a cane and walked with an antalgic gait.  He had mild tenderness, decreased lumbar range of motion, and a positive straight leg raising test on the right, but he was neurologically intact.  Dr. J. Johnson assessed L4-5 radiculopathy and ordered an MRI.  The MRI subsequently showed a large disc herniation at L5-S1, displacing the S1 and S2 nerve roots on the left and mildly impinging on the S1 nerve root on the right (Tr. 153-54).

At a February 26, 2002, follow-up visit, Dr. J. Johnson noted the disc disruption and degenerative changes, but indicated there was no strength loss or reflex loss.  He opined that the plaintiff could not return to heavy duty work and provided analgesic medication for his arthritis and a lumbar steroid injection (Tr. 150-51).

On March 15, 2002, the plaintiff returned to Dr. J. Johnson, who indicated he was doing "extremely well" and had only occasional pain.  He indicated the plaintiff was not taking any narcotics and was not working.  On examination, he had mild weakness in his feet, decreased deep tendon reflexes, and "considerable pain."  Dr. J. Johnson provided another lumbar steroid injection (Tr. 149, 151).

On April 30, 2002, a State agency physician reviewed the plaintiff's records and completed a "Physical Residual Functional Capacity Assessment" form relating to his expected abilities as of December 2002, 12 months after the onset of his alleged disability.  The physician found the plaintiff would be able to lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk about six hours in an eight-hour day, and sit about six hours

6

in an eight-hour day.  The physician also found the plaintiff would be able to frequently balance, kneel, and crouch, and occasionally climb, stoop, and crawl.  The physician noted that the plaintiff had improved with treatment thus far, and that this assessment was a reasonable projection of the plaintiff's expected limitations (Tr. 110-17).

The plaintiff returned to Dr. J. Johnson on May 7, 2002, and indicated that despite taking Bextra for his arthritis, he still had "fairly mild to moderate" low back and left leg pain.  Dr. J. Johnson recommended repeat surgery and referred him for a consultation (Tr. 147).

On June 25, 2002, the plaintiff presented to spinal surgeon Dr. Donald R. Johnson ("Dr. D. Johnson") for a surgical consultation.  Dr. D. Johnson noted the plaintiff was involved in vocational rehabilitation and that he was considering returning to school. Dr. D. Johnson recommended a repeat laminectomy and discectomy with removal of the current disc herniation (Tr. 145-46).

On August 1, 2002, Dr. D. Johnson diagnosed status-post surgery for lumbosacral radiculopathy secondary to L5-S1 disc disruption.  Dr. D. Johnson opined that the plaintiff was out of work and "unable to perform any type of work for 1 year" (Tr. 145).

On August 7, 2002, the plaintiff underwent his second back surgery (Tr. 104, 159).  Dr. D. Johnson completed a "Patient Status Report" form and indicated that the plaintiff could not perform any type of work for one year (Tr. 145).  At a follow-up visit with Dr. D. Johnson on August 20, 2002, the plaintiff was "healing well" and "doing excellently" (Tr. 144).

On September 17, 2002, Dr. D. Johnson again noted that the plaintiff was "doing very well," that his radicular symptoms were "much better," and that he had experienced an "excellent outcome thus far" (Tr. 143).

On January 21, 2003, Dr. D. Johnson found the plaintiff had reached maximum medical improvement.  He assigned a 20% whole person impairment, but noted

7

that this rating did not speak to disability or any work issues. He opined that the plaintiff would "have a difficult time with employment in the types of work he has done in the past" (Tr. 142).

On March 3, 2003, the plaintiff presented to orthopaedist Dr. Edward R. Blocker for a lumbar spine evaluation at the request of vocational rehabilitation staff. The plaintiff said his back pain was exacerbated by prolonged standing, walking, and "especially driving." On examination, the plaintiff had tenderness to palpation, but a straight leg raising test was negative bilaterally for pain. His reflexes were 1+ and symmetrical at the patella and 2+ and symmetrical at the Achilles tendon. The plaintiff had intact sensation and full 5/5 strength in his lower extremities. Range of motion in the hips was nontender. Dr. Blocker assessed low back pain status post recurrent herniated disc status post two surgeries. He noted the plaintiff's continuing discomfort, and opined that "he would be best placed in a light work category" (Tr. 125-26). The plaintiff testified at the hearing that his examination by Dr. Blocker lasted "for not 3 minutes." He reported that the doctor asked him what the problem was and then asked him to move his arms and shoulder, "and that was it." The plaintiff further reported that Dr. Blocker did not ask him to bend his back nor did he examine his back (Tr. 195-96).

On March 13, 2003, a State agency physician reviewed the plaintiff's records and completed a "Physical Residual Functional Capacity Assessment" form. The physician found the plaintiff could currently lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk about six hours in an eight-hour day, and sit about six hours in an eight-hour day. The physician also found the plaintiff could never climb ladders, ropes, or scaffolds, but that he could occasionally climb ladders or stairs, balance, stoop, kneel, crouch, and crawl (Tr. 128-35).

On April 18, 2003, Dr. D. Johnson completed a "Lumbar Spine Impairment Questionnaire." He found the plaintiff had a "poor– guarded" prognosis. He found that in

8

an eight-hour day, the plaintiff could sit for two hours and stand or walk for two hours. He found the plaintiff could sit and stand in 30-minute intervals, and that he should not stand or walk continuously. Dr. D. Johnson indicated the plaintiff could lift and carry five pounds frequently and 10 pounds occasionally, and that he could never lift or carry over 10 pounds. His clinical findings including a limited range of motion in the lumbosacral spine, tenderness at the surgical site, muscle spasm, swelling, abnormal gait, sensory loss on the left lower leg, reflexes changes in the ankle, calf weakness and atrophy, trigger points, and positive straight leg raising test on the left at 45 degrees and on the right at 90 degrees. He indicated that the plaintiff took non-codeine pain medications, and that he had not substituted medications in an effort to lessen symptoms. He stated that the plaintiff's pain was severe enough to frequently interfere with attention and concentration, and that he expected the plaintiff's impairments to last at least 12 months. Dr. D. Johnson cited the results of an MRI on February 19, 2002, which showed a large recurrent herniated nucleus pulposus at L5-S1 on the left as supporting his diagnosis. He found the plaintiff could tolerate low levels of work stress. Dr. D. Johnson found that the plaintiff would need to take breaks every 30 minutes for 15 minutes at a time, that he could not perform a job requiring sustained activity, and that he was likely to be absent more than three times per month. He further found that the plaintiff needed to avoid wetness, heights, pushing, pulling, kneeling, bending, and stooping (Tr. 118-24).

The plaintiff returned to Dr. D. Johnson on April 24, 2003, with complaints of ongoing pain. Dr. D. Johnson indicated that this was expected due to disc space collapse after the second surgery. He indicated that the plaintiff's prognosis for recovery was limited, and opined that he met the requirements for Social Security disability benefits (Tr. 140).

On August 15, 2003, State agency physician Dr. F. Keels Baker reviewed the plaintiff's records and completed a "Physical Residual Functional Capacity Assessment" form. Dr. Baker found the plaintiff could lift 20 pounds occasionally and 10 pounds

frequently, stand and/or walk about six hours in an eight-hour day, and sit about six hours in an eight-hour day.  He found the plaintiff could never climb ladders, ropes, or scaffolds, but that he could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl (Tr. 161-68).

At the hearing on April 26, 2004, the plaintiff testified that he could drive a pickup truck and that he still had a valid commercial driver's license (Tr. 180-81).  He indicated that he had driven six hours to Jacksonville, Florida, and then back home in the same day, for a total of 12 hours, to test whether or not he could be a truck driver again, but that after that trip he experienced significant back pain (Tr. 197).  He admitted that his first surgery was successful, and that he had returned to work against his doctor's advice (Tr. 184).  At that time, his job as a mechanic required "a lot" of bending, lifting, stooping, and heavy lifting (Tr. 185).  He stated that he could currently stand for "[a]n hour or two" at a time and sit for "[a]n hour or two" at a time (Tr. 190-91).  He said he could lift a 50-pound bag of dog food, which he usually transported via wheelbarrow instead of carrying it directly, and indicated that he could not lift or carry anything on a frequent basis (Tr. 198).  He reported that bending aggravated his back (Tr. 192-93).  The plaintiff testified that in a typical day, he would wash a few dishes, check e-mail, read, walk around outside, mow the lawn in 15-minute increments, feed his dogs, and watch television (Tr. 196).

The ALJ asked vocational expert Dixon Pearsall, Ph.D., the following hypothetical question:

> So let's assume we have a person . . . who is age 43, has a
> high school education, is limited to no more than light exertional
> level work. Wouldn't have to lift any more than 20 pounds
> occasionally, and up to 10 pounds on a more frequent basis.
> And there would be postural restrictions so that there would be
> no crawling or crouching or climbing or squatting or kneeling.
> There'd be lower extremity limitations so there's no use of the
> legs or feet for pushing or pulling foot or leg controls. There
> would be upper extremity limitations, so there would be no use
> of the upper extremities for work above shoulder level, and the

> job would offer the ability to alternate between sitting and
> standing, and still allow a person to perform the job duties. Are
> there light unskilled – or excuse me, light, sit/stand jobs that
> exist in the State of South Carolina and national economy that
> would otherwise fit that hypothetical?

(Tr. 200-01).  Dr. Pearsall responded that the individual could perform the light jobs of

storage facility clerk (DOT #295.367-026, 500 jobs in South Carolina and 20,000 jobs in the

nation), attendant at a self-service or convenience store (DOT # 299.677-010, 25,000 jobs

in South Carolina and 800,000 jobs in the nation), and grader/sorter (DOT # 789.687-146,

6,000 jobs in South Carolina and 250,000 jobs in the nation).  Dr. Pearsall testified that the

DOT did not reference the sit/stand option, but that he was familiar enough with the jobs

to know that they allowed for it (Tr. 202).  He also testified that a restriction to only

occasional bending would not eliminate the jobs cited (Tr. 203-04).

In the Disability Report submitted with his application for benefits, the plaintiff

stated that he had recently worked in his garden, but that after three hours of "bending and

planting," he stopped due to pain.  He indicated that he spent his days alternating between

walking, sitting, and standing (Tr. 86).

## ANALYSIS

The plaintiff alleges disability commencing December 26, 2001, due to severe

back pain and a herniated disc in the lumbar spine.  The ALJ found that the plaintiff could

perform a significant range of light work and, based upon the testimony of the vocational

expert, he determined that there are a significant number of jobs in the national economy

that he could perform.  He cited the jobs of storage facility clerk, attendant at a convenience

store, and a grader/sorter as examples of such jobs (Tr. 22).  The plaintiff alleges that the

ALJ erred by (1) failing to give adequate weight to the opinion and assessment of the

plaintiff's treating physician, Dr. D. Johnson; (2) failing to properly consider the plaintiff's

subjective complaints; and (3) improperly relying on the vocational expert's testimony.

11

***Treating Physician***

The plaintiff first argues that the ALJ did not properly evaluate the opinion of his treating physician, Dr. D. Johnson. The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §416.927(d)(2) (2004); *Mastro v. Apfel*, 370 F.3d 171 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p, 1996 WL 374188, *5. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5.

This court agrees that the ALJ erred by not giving controlling or at least substantial weight to the opinion of Dr. Johnson, who is a board-certified orthopedic surgeon who had treated the plaintiff on a frequent basis for over three years. As discussed by the plaintiff in his brief, Dr. Johnson's opinion regarding the plaintiff's functional limitations was based on clinical examination findings such as a limited range of motion in

12

the lumbosacral spine, tenderness at the surgical site, muscle spasm, swelling, abnormal gait, sensory loss on the left lower leg, reflexes changes in the ankle, calf weakness and atrophy, trigger points, and positive straight leg raising test on the left at 45 degrees and on the right at 90 degrees.  Dr. Johnson noted that he had treated the plaintiff approximately every four to eight weeks for three years, and he cited the findings of an MRI previous to the plaintiff's second surgery (Tr. 118-19).  Dr. Johnson stated that since the second surgery the plaintiff had continued pain and weakness along the L5-S1 nerve root distribution in his left leg.  Dr. Johnson noted that the plaintiff's back had been operated on twice and that post-surgical back pain was expected due to disc space collapse after the second surgery (Tr. 140).  Accordingly, Dr. Johnson found that in an eight-hour day, the plaintiff could sit for two hours and stand or walk for two hours, could sit and stand in 30-minute intervals, and that he should not stand or walk continuously.  The plaintiff could lift and carry five pounds frequently and 10 pounds occasionally, and he could never lift or carry over 10 pounds.  Dr. Johnson found that the plaintiff would need to take breaks every 30 minutes for 15 minutes at a time, that he could not perform a job requiring sustained activity, and that he was likely to be absent more than three times per month.  He further found that the plaintiff needed to avoid wetness, heights, pushing, pulling, kneeling, bending, and stooping (Tr. 118-24).

The ALJ rejected Dr. Johnson's opinion by referring to portions of the medical record where Dr. Johnson stated that the plaintiff was "healing excellently" (Tr. 18).  As pointed out by the plaintiff, these reports were each within six weeks of the plaintiff's most recent surgery and were made within the context of the healing of the surgical site and suture removal pertaining to that procedure, and not as to the plaintiff's overall condition, as shown by subsequent reports (Tr. 143-44).  Although one report states that the plaintiff's radicular symptoms were much better, this report was made just five and a half weeks after surgery and does not appear to be reflective of subsequent reports.  After the surgery, the

13

plaintiff began physical therapy, but that failed to alleviate his symptoms of pain and reduce

his weakness and radiculopathy (Tr. 140).  By April 2003, Dr. Johnson opined that the

plaintiff's limitations as presented in the "Lumbar Spine Impairment Questionnaire" were

permanent (Tr. 140).  It appears to this court that those findings were supported by

medically acceptable clinical and laboratory diagnostic techniques.

   The ALJ found that Dr. Johnson's opinion was inconsistent with other

substantial evidence in the case.   This court disagrees.  The ALJ cited the opinion of Dr.

Blocker, the consultative examiner who conducted a one-time examination for the

Administration, as contradictory evidence.  Dr. Blocker opined the plaintiff could perform

light work (Tr. 19-20).  However, the plaintiff testified at the hearing that the examination by

Dr. Blocker lasted less than three minutes and the doctor did not even examine his back,

but only examined his arms and shoulders (Tr. 195-96).  During his closing statement, the

plaintiff's attorney reiterated that Dr. Blocker's examination was cursory and objected to the

evidence and any weight that would be attributed to it.  The ALJ responded, "All right.  So

that's what we're going to do then.  We'll definitely . . . give appropriate weight, let's put it

that way. . . .   And I'll take into consideration that it was a very cursory examination" (Tr.

207-208).  However, it appears that he gave more weight to this opinion than that of Dr.

Johnson, and he mentioned nothing about the plaintiff's contentions about the cursory

nature of the examination.

   As argued by the plaintiff, even if Dr. Johnson's opinion was not given

controlling weight, it was still entitled to great weight (pl. brief 16-17).  As stated in Social

Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well
> supported  by  medically  acceptable  clinical  and  laboratory
> diagnostic techniques or is inconsistent with the other substantial evidence in the case
> record means        only that the opinion is not entitled to "controlling
> weight," not that the opinion should be rejected.
> Treating source medical opinions are still entitled
> to deference and must be weighed using all of

> the factors provided in 20 C.F.R. 404.1527 and
> 416.927.  In many cases, a treating source's
> opinion will be entitled to the greatest weight and
> should be adopted, even if it does not meet the
> test for controlling weight.

SSR 96-2p, 1996 WL 374188, *4.

> In rejecting Dr. Johnson's opinion, the ALJ stated:

> The possibility always exists that a doctor may express an
> opinion in an effort to assist a patient with whom he
> sympathizes for one reason or another.  Another reality, which
> should be mentioned, is that patients can be quite insistent and
> demanding in seeking supportive notes or reports from their
> physicians, who might provide such a note in order to satisfy
> their patient's requests and avoid unnecessary doctor/patient
> tension.  While it is difficult to confirm the presence of such
> motives, they are more likely in situations where the opinion
> departs substantially from the rest of the evidence of record, as
> in the current case.

(Tr. 18).  As argued by the plaintiff, the ALJ improperly disregarded the opinion of Dr.

Johnson on the basis of conjecture (pl. brief 17).  Based upon the foregoing, a remand is

necessary for a proper evaluation of the treating physician's opinion.

### *Subjective Complaints*

The plaintiff next argues that the ALJ failed to properly evaluate his subjective

complaints of pain.  A claimant's symptoms, including pain, are considered to diminish his

capacity to work to the extent that alleged functional limitations are reasonably consistent

with objective medical evidence and other evidence.  20 C.F.R. §§404.1529(c)(4) and

416.929(c)(4).  Furthermore, "a formalistic factor-by-factor recitation of the evidence" is

unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating

the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001).  Social

Security Ruling 96-7 states that the ALJ's decision "must contain specific reasons for the

finding on credibility, supported by the evidence in the case record."  Furthermore, it "must

be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight."  SSR 96-7p.

The ALJ found that the plaintiff's testimony concerning the severity of his symptoms was not fully credible.  Specifically, he stated:

> Although the claimant alleges that he became unable to work due to back pain in December 2001, there is no evidence that he sought medical treatment for his allegedly disabling condition until February, 2002. The claimant's delayed response in seeking treatment leads one to question whether his back problems were and are as severe as alleged.

> The claimant has described daily activities, including carrying 6 wheelbarrows of dirt and gardening in April, 2002, which are not limited to the extent one would expect, given his complaints of disabling symptoms and limitations.

> The fact that the claimant does not regularly take narcotic-based pain relieving medications in spite of his allegations of quite limiting pain limits the credibility of his description of the pain.

(Tr. 17-18).

The plaintiff argues that the gap between the alleged onset of December 26, 2001, and February 1, 2002, when the plaintiff saw Dr. J. Johnson for treatment, is not so substantial as to question the severity of the impairment.  This court agrees.  Further, the record shows that the plaintiff made his appointment with Dr. J. Johnson in *the first week of January*, just a week after his alleged onset date (Tr. 186).  The ALJ also drew a negative inference from the fact that the plaintiff does not regularly take narcotic-based drugs, without first considering any explanation the plaintiff might provide.  *See* SSR 96-7p, 1996 WL 374186, *5 ("[T]he adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.").  According to medical records dated November 29, 2000, the plaintiff is allergic to codeine-based medications (Tr. 158).  Further, Dr. D. Johnson reported that the plaintiff had been prescribed non-codeine-based medication for pain, but the plaintiff's

pain had not been completely relieved (Tr. 118-22). The ALJ failed to discuss the medication that the plaintiff was taking or had taken, including Vioxx, Bextra, and Propoxy, which is a mild narcotic medication used to relieve moderate to severe pain. Lastly, the sporadic attempts at activity cited by the ALJ were made while he was undergoing pain management with Dr. Johnson during the early part of 2002, prior to his redo laminectomy in August 2002. Based upon the foregoing, this court finds that a remand is warranted for a proper credibility analysis.

### *Vocational Expert*

Lastly, the plaintiff contends that the ALJ improperly relied on the vocational expert's testimony (pl. brief. 17-19). The vocational expert testified that three jobs met the ALJ's hypothetical: storage facility clerk, convenience store attendant, and grader/sorter (Tr. 201). These jobs are all considered unskilled. 20 C.F.R. §404.1568(a). Upon cross-examination by the plaintiff's attorney, the vocational expert testified that "you can perform the primary function of the job sitting or standing at your discretion" (Tr. 204). While the ALJ noted in his opinion that the expert testified that his opinions were consistent with the occupational information provided in the Dictionary of Occupational Titles ("DOT"), what he actually stated was that the "DOT does not reference sit/stand" (Tr. 202).

> Social Security Ruling 00-4p provides in pertinent part:
>
> When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

17

SSR 00-4p, 2000 WL 1898704, *3.

Social Security Ruling 83-12 addressed the issue of the availability of the sit-stand option for unskilled jobs:

> There are some jobs in the national economy - typically professional and managerial ones - in which a person can sit or stand with a degree of choice.  If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled.  However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task.  Unskilled types of jobs are particularly structures so that a person cannot ordinarily sit or stand at will.  In cases of unusual limitation of ability to sit or stand a [vocational expert] should be consulted to clarify the implications for the occupational base.

SSR 83-12, 1983 WL 31253, *4.  When asked whether unskilled jobs provide for the sit/stand option generally, the vocational expert stated, "[I]t's not referenced that it would be in the DOT, so whether it was skilled or not would not preclude or support sit/stand" (Tr. 204).  As argued by the plaintiff, ALJ should have made an effort to reconcile the apparent conflict between the vocational expert's testimony and the DOT and Social Security Ruling.  Accordingly, the ALJ improperly relied on the vocational expert testimony, and remand is necessary.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe
United States Magistrate Judge

December 21, 2005

Greenville, South Carolina